## L. George v. H. Demouy.

Proof that the owner of a slave intended he should be free, and that neither he nor his heirs after his death claimed his services, will not entitle the slave to his freedom, it not being shown that he had ever enjoyed his liberty for the space of ten years.

APPEAL from the District Court of the Parish of Pointe Coupée, *Ratliff*, J. T. J. & W. H. Cooley, for plaintiff. *Provosty* and *Phillips*, for defendant and appellant.

MERRICK, C. J. The plaintiff sues to recover his freedom. Since bringing the suit he has become a fugitive from the services of defendant. Under such circumstances, we have some hesitation on the question whether plaintiff's action ought not to be dismissed, as in case of nonsuit, and whether we ought to decide the case on the merits. But, as the defendant is appellant, we have concluded he has a right to a judgment upon the merits of the controversy.

It appears that *Leon George*, the plaintiff, and his mother were the slaves of one *Guy Richard*. *Leon George* was born in 1833, and, at the time the suit was brought, was about twenty-four years of age. In 1834 *Guy Richard* desired to place the plaintiff under the charge of the wife of the overseer of *Benjamin Poydras*, the plaintiff then being about twelve months old, the reason given was the bad behavior of the mother of the child. *Richard* died the next day of the cholera, and the child, with a servant to take care of him, was sent to the house of the overseer by *Poydras*.

*Leon George* with his mother and her other children were inventoried as belonging to the estate of *Guy Richard*.

*Benjamin Poydras* acted for the heirs (who resided in France) as agent, and made sale of the property with the exception of *Leon George*.

In 1838 he sold the mother of *Leon George* and her other children to the defendant and one *Josephine*. *Leon George* himself was expressly exempted from sale, though then but about five years of age.

In 1843 the defendant obtained possession of the plaintiff, and kept him and enjoyed the benefit of his labor until he ran away, after the institution of this suit.

There is much testimony in the record introduced to show, that *Guy Richard* and his heirs intended that *Leon George* should be free, and some conversations are testified to in which the defendant promised to procure the freedom of the plaintiff, and one or two in which he said he was free. Witnesses also swear to some conduct of defendant which would be inconsistent with the idea of the plaintiff's condition as a slave, were it not for the supposed defective title under which the defendant held *Leon George* with reference to the heirs of *Guy Richard*. Notwithstanding this proof, it is shown by witnesses of great respectibility, that defendant treated *Leon George* as he did his other slaves. The plaintiff, so far as the record discloses, never asserted his freedom, and never left the service of defendant until he absconded, after the bringing of this suit. The plaintiff appears to have only availed himself of the indiscreet indulgences of the defendant, without any thought of thereby claiming or asserting his freedom. On the contrary, he admitted he was a slave, to a person who wished to bargain for him.

19

GEORGE          However desirous the heirs of *Guy Richard* may have been that the plaintiff
   *v.*       should become free, their wishes alone could not make him so.
DEMOUY.
                This being a matter affecting the public order required the action of the public
authorities before it could be brought about.

It is clear that in this controversy it is a matter of no consequence who is
owner. Whether the defendant or the heirs of *Guy Richard.* C. C. 177; 4 M.
580; 8 M. 149.

The only question which we can consider is, whether the plaintiff had acquired
the *status* of a free person of color prior to the promulgation of the Act of 1857,
which now prohibits emancipation.

Waiving the question whether a slave child or a slave under twenty-one or
even thirty years of age could have the legal intention to become free and exercise
acts of freedom under our previous laws, it is quite clear that the plaintiff has
never enjoyed his liberty for one week, much less the space of ten years. He has
been all his life under the control of others, who have enjoyed the benefit of his
labor. It matters not so far as this controversy is concerned, whether the de-
fendant has acted in good or bad faith, nor whether he has acted against the
wishes of the heirs of *Guy Richard;* if the plaintiff cannot show the facts on
which the law declares his emancipation or freedom he must fail in his action.

See *Carmouch, administrator,* v. *Carmouch,* 12 An. 721; and *Verdun* v.
*Splane,* 6. Rob. 531.

The judgment of the lower court, which was in favor of the plaintiff, must be
reversed.

It is, therefore, ordered, adjudged and decreed by the court, that the judgment
of the lower court be avoided and reversed, and that there be judgment against
the demand of the plaintiff and in favor of the defendant, and that the plaintiff pay
the costs of both courts.

COLE, J., dissenting. Article 3510 of the Civil Code provides, that " if a
master suffer a slave to enjoy his liberty for ten years, during his residence in
the State, or for twenty years while out of it, he shall lose all right of action to
recover possession of the slave, unless the slave be a runaway or fugitive."

The prohibition of emancipation in the State does not apply to the acquisition
of freedom by prescription.

The statute of 1857 reads thus : " That from and after the passage of this Act
no slave shall be emancipated in this State." Session Acts, 1857, p. 55. The
statute is entitled " An Act to prohibit the emancipation of slaves."

Emancipation is used technically, and according to its meaning in the jurispru-
dence of Louisiana, it signifies the obtaining of freedom, after certain preliminary
proceedings, by the decree of a court of justice. *Eulalie and her children* v. *Long
et al.,* 9 An. p. 10; Bullard & Curry's Digest, p. 427 to 430; Sess. Acts 1852,
p. 214; C. C. Arts. 184, 185.

Article 3510 is not repealed by the statute of 1857; they are not upon the
same subject-matter. The former provides for the loss of action of the master to
recover possession of the slave after he has been permitted to enjoy his liberty
for a certain time; the latter forbids the enfranchisement of slaves by the techni-
cal mode of emancipation.

According to Article 3510, if a master suffer a slave to enjoy his liberty for a
certain time, he loses all right to recover possession of him. The use of the word
"slave" in the third line of this Article merely designates the person already spoken
of in the first line, and it does not signify that he is a slave after the ten or twenty

years. The slave after that time must then be free, and he becomes subject to the laws relative to free persons of color, for if the master cannot claim him, certainly no other person could. If the slave were not then free, there would be no sense in the Article, for if the master could not assert title to him, no other person ought to be allowed to do so, and if no one can claim him he is free. *Spalding* v. *Taylor*, 1 An. 197; *Eulalie* v. *Long & Mobray*, 11 An. 463.

The signification of enjoyment of liberty in Article 3510 is, that the master does not exercise any control over his slave. If the intention of the owner be clear, that for the time required by law he has not exercised or wished to exert any control over him, it is then evident that the dominion exercised over the slave by a stranger cannot interfere with the right of the slave to his liberty.

This Article does not limit its provisions to slaves over twenty-one years of age. The word slave applies to a minor as well as a major, and where the law makes no distinction the judiciary cannot.

The case of *Verdun* v. *Splane*, 6 R. 531, does not apply to the one at bar. In that case the mother had been emancipated when the slave claiming his freedom was about eight months old, and the infant was permitted to remain with the mother for ten years, in order to be suckled and raised. It was clearly shown that the master had not ceased to exercise control over his slave, and had had no such intention. The court very properly decided that the owner had not lost, under Article 3510, the right to claim him.

The old Code did not contain the provisions of Article 3510 of the Code of 1825; the case of *Meilleur et al.* v. *Coupry*, 8 N. S. 129, is not, therefore, applicable to the present controversy.

Under Article 3510 plaintiff ought to succeed in this suit.

It appears that since the death of his master, in 1834, he has not been under the control of his master's representatives and heirs, and they have never claimed him as a slave.

The intention of the heirs to allow plaintiff to enjoy his liberty is clearly established.

*Benjamin Poydras Delallande* was the testamentary executor of the master of plaintiff and agent of his master's heirs. In 1838 he sold the mother of plaintiff and two of her children, and in the act of sale it is expressly stipulated that he did not sell the plaintiff " *Leon*" with his mother : " N'entendant pas comprendre dans la présente vente le fils aîné de la dite négresse *Olive*, nommé *Léon*, condition sans laquelle la présente vente n'aurait pas lieu, et serait de droit annullée si les dits acquéreurs venaient à l'exiger.

*Delallande*, the agent, having sold all the property of the estate, except plaintiff, went to France and accounted to his constituents.

This clause in the act of sale and the conduct of the agent and heirs show that it was the intention of the master of plaintiff to allow him to enjoy his liberty, and that they did not wish to oppose this intention.

The evidence shows that in 1834, *Richard*, the master of plaintiff, died, and the plaintiff was then a year old.

That *Richard* had much affection for the infant, and said a day or two before his death that he wished to place *Leon* under the care of *Mrs. Willis*.

He died before sending the child, but shortly after his death the executor of *Richard* sent him to her, and he remained with her till 1843.

After the death of the executor, defendant, who is the god-father of plaintiff,

asked *Mrs. Willis* to send plaintiff to see his mother at his house, saying also, that he desired to make him some presents, and that he would not keep him but a week.

Defendant having thus obtained possession of plaintiff refused to return him to *Mrs. Willis*, and has thus kept him at his house up to about the time of the institution of this suit in 1857.

It is shown that defendant treated plaintiff as a free child and admitted that he was free.

One of the witnesses also states, that defendant told him in the court-house yard, when he was there as a witness cited in this suit not to say too much, " ne parle pas trop."

The evidence in the record, establishing that the owners of plaintiff had not exercised the control of masters over him for the last twenty-five years, being full and clear ought to be at least considered sufficient when the contest is with a mere usurper, with one who got possession of plaintiff under the pretence of affection, of being his god-father, and in order to enable him to see his mother. One who could thus act ought not to have the favorable consideration of a court of justice in his attempt to reduce to slavery one over whom he has no right, but that of the strong over the weak.

Even if plaintiff never asserted his freedom until this suit, and did not leave the service of defendant until recently, still ignorance of his rights cannot divest him of them.

Besides he had no reason to abandon the domicil of defendant, as long as he was treated not as a slave, but a friend.

The control exercised over plaintiff during the greater part of his life by defendant, was not that of a master and owner, for defendant cannot, by his own will, change the nature of his tenure of plaintiff. He got possession of him under false pretences, and he ought not to be allowed to derive any benefit from a possession obtained by treachery, and from a control over the plaintiff, exercised without any permission from his master or heirs.

During the time of the residence of plaintiff with defendant, his master exercised no control over him. This action of the master for fourteen years, shows that his intention for the ten years previous was to allow plaintiff to enjoy his liberty. The residence of the first ten years of his life with *Mrs. Willis*, might not of itself be deemed absolute proof of the intention of the owner in leaving him with her, but when conjoined with the subsequent freedom from the control of the master, the intention of the owner, since, 1834, becomes conclusive.

When a slave has thus, by prescription, obtained freedom from the right of action of the master, it is not necessary to have any action of the public authorities to enable him to be free of the control of private usurpers of his rights.

If the master could not successfully institute an action to recover possession of his former slave, certainly the latter must have the right of action to assert his freedom from the control of a mere trespasser ; otherwise the latter could exert a greater power over the plaintiff, than his ancient master.

If there were any doubt as to the right of plaintiff to recover his freedom as against the defendant, the doubt ought to be decided in favor of plaintiff.

For twenty-five years he has not been claimed by his former owners, and they have not for that time exercised any control over him. He now asks to be allowed to enjoy what they willingly gave him.

If defendant succeeds in this suit, his conduct will enable him to be enriched

at the expense of the former owners, and plaintiff will be reduced to slavery and the dominion of one who has no title whatever to him.

In such a contest, the technical rules of law ought to be construed with as much rigidity in favor as against him, whose only hope is in the protection that this court may afford him.

I am, therefore, of opinion that the judgment, which was in favor of the freedom of plaintiff against the defendant, ought to be affirmed.